IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

MICHAEL M. MARTINEZ,

                    Plaintiff,                         CV-09-580-ST

         v.                                  FINDINGS AND
                                                 RECOMMENDATIONS

MAX WILLIAMS (Director, Oregon Department
of Corrections); MARK NOOTH (Superintendent
Snake River Correctional Institution); SNAKE
RIVER CORRECTIONAL INSTITUTION
TOWER SHOOTER "X" (NUNN OR DUNN?),

                    Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

       Plaintiff, Michael Martinez ("Martinez"), appearing *pro se*, is an inmate with the Oregon

Department of Corrections ("ODOC"). In the spring of 2008, Martinez was housed at the Snake

River Correctional Institution ("SRCI"), in Ontario, Oregon. SRCI is a multi-security

1 - FINDINGS AND RECOMMENDATIONS

correctional facility located in Malheur County near the Oregon-Idaho border which is capable of housing approximately 3,000 inmates.

On April 6, 2008, while trying to break up a prison yard riot, an SRCI tower guard, Doug Fletcher ("Fletcher"), shot Martinez with a .223 caliber rifle, causing severe injuries to Martinez's groin and genitalia. Martinez filed this case against the Director of ODOC, Max Williams ("Williams"), the Superintendent of SRCI, Mark Nooth ("Nooth"), and SRCI "Tower Shooter 'X' (Nunn or Dunn?)" on May 27, 2009. Although it is undisputed that Fletcher is the tower guard who shot Martinez, Martinez has never amended his pleadings to name Fletcher as a defendant. However, for purposes of the pending motions, this court will assume that "Tower Shooter 'X'" is Fletcher.

Martinez alleges claims under 42 USC § 1983 for violations of the Eighth Amendment (First Claim) and the Ninth Amendment (Second Claim). Martinez also alleges supplemental claims for violations of Article I, Sections 1 and 13, of the Oregon Constitution (Third and Fourth Claims) and for common law negligence (titled as a claim for common law "personal injury") (Fifth Claim). Martinez seeks $30 million in compensatory damages, which calculates out to "$600,000.00 per year for his 50 year life expectancy." Complaint, p. 13; Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (docket #38), p. 6.

Now before this court are Martinez's Motion for Summary Judgment (docket #36) and defendants' Cross Motion for Summary Judgment (docket #45). On July 15, 2010, this court issued a Summary Judgment Advice Notice (docket #52), advising Martinez of the requirements pertaining to such motions. For the reasons that follow, Martinez's motion should be denied, defendants' motion should be granted, and judgment should be entered in favor of defendants.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FRCP 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). On a motion for summary judgment, the court "must view the evidence on summary judgment in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F3d 1116, 1122 n1 (9th Cir 2009) (internal quotation omitted).

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the non-moving party. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F3d 1132, 1136 (9th Cir 2001). A court may not grant summary judgment if the court finds unresolved issues of material fact, even where the cross-motions allege that no disputed facts exist. *Id.*

## UNDISPUTED FACTS

Viewed in the light most favorable to Martinez, the record reveals the following:

On April 5, 2008, several of SRCI's Hispanic inmates assaulted a Caucasian inmate. That altercation apparently involved "a power struggle over recreation yard equipment." Gilbertson Decl., ¶ 3. The following morning, on April 6, 2008, SRCI officials decided to "serve the breakfast meal slowly and evaluate the interaction" between the Hispanic and Caucasian

inmates. Premo Decl., Att. 3, p. 7. Due to "no observable issues that would cause notable concern," SRCI officials opened the Complex 2 recreation yard and allowed approximately 200 inmates to enter. *Id*. Correctional officers Randy Gilbertson ("Gilbertson") and A. Ponce supervised inmate movement into the yard. Gilbertson Decl., ¶ 4.

Fletcher, who has been a correctional officer with ODOC since 1998, began his April 6, 2008 shift at SRCI at 7:45 a.m. Prior to entering the guard tower, he checked with supervisory staff about inmate attitudes that morning. Fletcher was aware of the incident between the Hispanic and Caucasian inmate the previous night. Fletcher was assigned to Complex 2 as the Tower 4 officer, which he entered at 8:45 a.m. Fletcher Decl., ¶ 5.

Shortly after the recreation yard opened, two groups of inmates began gathering in the grass outfield and faced off against each other. *Id*, ¶ 6; Gilbertson Decl., ¶ 5. Soon after, over 100 inmates[1] ran at each other and began physically fighting. *Id*. The fight escalated to large scale, assaultive, riotous behavior and inmates were forming groups punching and kicking fallen inmates. Fletcher Decl., ¶ 8; Gilbertson Decl., ¶ 5.

Staff responded to the recreation yard. Gilbertson Decl., ¶ 6. Fletcher was on duty in Tower 4, stationed on the catwalk outside of the tower. Fletcher Decl., ¶ 7. Another guard, Nathan Aldred ("Aldred"), was stationed in Tower 2. Premo Decl., Att. 3, pp. 7-8. Both Aldred and Fletcher shouted verbal warnings for inmates to stop fighting. *Id*; Fletcher Decl., ¶ 7.

---

[1] The estimates of the number of inmates vary somewhat, but no estimate is lower than 100 inmates. Gilbertson Decl., ¶ 5 (approximately 150 inmates); Fletcher Decl., ¶ 6 (approximately 120 combatants); Plaintiff's Concise Statement of Material Facts (docket #37), p. 1 ("fights broke out between the 120 or so inmates in that yard, the fighting along racial lines") and Ex. 11-D (Delzell Aff.), p. 5 (50 Hispanic inmates and at least 50 Caucasian inmates).

A group of inmates 50-60 yards away ignored Fletcher's verbal warnings, while other inmates 80 to 100 yards away heard his warnings and got down on the ground. *Id.*

Aldred fired two warning shots into a sand pit. Premo Decl., Att. 3, p. 7. At or around the same time, Fletcher fired three warning shots into a sand pit. *Id*; Fletcher Decl., ¶ 8. The warning shots were ignored by the fighting inmates. *Id*; Gilbertson Decl., ¶ 6.

Gilbertson saw an inmate on the ground surrounded by a group of Hispanic inmates who were repeatedly kicking him in the sides and head. *Id*, ¶ 7. He called the tower indicating lethal force was necessary, as the downed inmate was at risk of serious injury or death. *Id*, ¶ 7 & Att. 1, p. 1.

Fletcher saw an inmate kicking a downed inmate in the head and face multiple times. Fletcher Decl., ¶ 9. Three or four other inmates were kicking the downed inmate in his body and legs.[2] *Id*. Fletcher aimed at the inmate who was kicking the downed inmate in the head and face and fired at his "center mass to stop him from assaulting the inmate on the ground." *Id*. Fletcher's shot hit Martinez who was about 234 feet away. Plaintiff's Exhibit 5A.[3]

Another SRCI inmate, Joel Delzell ("Delzell"), asserts that he was the downed inmate observed by Fletcher. Delzell Decl., p. 2. He contends that he was being kicked by between four and 10 other inmates. *Id*, p. 2. Delzell is good friends with Martinez and does not believe that Martinez was fighting with him or with Mark Greeley ("Greeley"), another inmate that Delzell

---

[2] It is unclear whether the incident observed by Fletcher was the same kicking incident that caused Gilbertson to call for the use of lethal force.

[3] A number of exhibits are attached to Martinez's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (docket #38). Citations to those documents are to Martinez's exhibit number.

saw being kicked by six or eight other inmates.  *Id*.  Delzell saw Martinez on the ground being

kicked by Caucasian inmates.  *Id*, pp. 2-3.

Gilbertson saw Martinez walking toward him after he had been shot.  Gilbertson Decl.,

¶ 8.  Gilbertson called for medical attention and assisted Martinez until medical staff arrived.  *Id*,

¶ 9.

ODOC issued a misconduct report charging Martinez with Assault I, Disobedience of an

Order I, Disturbance, and Unauthorized Organization I.  Martinez admitted the latter two charges

and was found guilty of all four violations.  He was sanctioned 180 days in Disciplinary

Segregation and ordered to pay $16,477.32 in medical restitution.  Premo Decl., ¶ 14 & Att. 4.

ODOC regulations require consideration of "every reasonable means of control before

resorting to the use of lethal force," but permit the use of lethal force to "prevent imminent

serious bodily injury or death to one's self or another person" or to "prevent or stop a riot or

other group disturbance where there is reason to believe an inmate poses a threat of escape or

imminent serious bodily injury or death to another person."  OAR 291-103-0100(1).

## FINDINGS

Other than the First Claim under the Eighth Amendment, none of Martinez's claims

require extensive discussion.  The Second, Third, Fourth, and Fifth Claims are each clearly

barred, either due to a lack of legal basis or due to the sovereign immunity enjoyed by the State

of Oregon and its agencies and officers.  Accordingly, this court first discusses the latter four

claims and then turns to the First Claim.

///

///

## I.  <u>Ninth Amendment to the United States Constitution (Second Claim)</u>

In his Second Claim, Martinez contends that he was deprived of the "fundamental human rights" of enjoying a "normal sexual relationship, having children, being physically whole at age 26 and the psychic contentment of such normalcy."  Complaint, p. 9.  Based on that deprivation, Martinez asserts a claim under the Ninth Amendment to the United States Constitution which states that "the enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

As noted by the Ninth Circuit, "[i]t has been argued that the ninth amendment protects rights not enunciated in the first eight amendments.  Nevertheless, the ninth amendment has never been recognized as independently securing any constitutional right for purposes of pursuing a civil rights claim."  *Strandberg v. City of Helena*, 791 F2d 744, 748 (9th Cir 1986); *see also Schowengerdt v. United* States, 944 F2d 483, 490 (9th Cir 1991) (citing *Strandberg* with approval).  Accordingly, Martinez's Second Claim is without merit.  Martinez's motion for summary judgment on the Second Claim should be denied, and defendants' cross motion for summary judgment against the Second Claim should be granted.

## II.  <u>Oregon Constitution (Third and Fourth Claims)</u>

The Third and Fourth Claims allege that defendants violated Martinez's rights under Article I, Sections 1 and 13, of the Oregon Constitution.  Article 1, Section 1, of the Oregon Constitution declares that  "all men, when they form a social compact are equal in right: that all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, and happiness; and they have at all times a right to alter, reform, or abolish the government in such manner as they may think proper."  Article 1, Section 13, of

the Oregon Constitution provides that "[n]o person arrested, or confined in jail, shall be treated with unnecessary rigor."

Martinez cannot recover damages based on these constitutional provisions.  The Oregon Supreme Court has determined that "a private right of action for damages against a municipality or its employees does not exist directly under the Oregon Constitution, but is limited to extant common-law, equitable, and statutory remedies." *Barcik v. Kubiaczyk*, 321 Or 174, 190, 895 P2d 765, 775 (1995), citing *Hunter v. City of Eugene*, 309 Or 298, 304, 787 P2d 881, 884 (1990). This rule has been applied to public bodies other than municipalities. *Id*; *Juran v. Independence Oregon Central Sch. Dist*., 898 F Supp 728, 730 (D Or 1995).  Instead, "the appropriate remedy for constitutional violations by public bodies, officers, employees and agents is the Oregon Tort Claims Act, ORS 30.260-30.300." *Juran*, 898 F Supp at 730.  Because the Oregon Constitution provides Martinez no direct means of relief, his motion for summary judgment on the Third and Fourth Claims should be denied and defendants' cross motion for summary judgment on the Third and Fourth Claims should be granted.

## III.  Personal Injury (Fifth Claim)

The Fifth Claim alleges a common law tort claim for personal injury against the three defendants, all of whom are employed by ODOC.  ODOC is an agency of the state of Oregon created under ORS 423.020.  ODOC performs essential governmental functions, including operating SRCI.

Under the Oregon Tort Claims Act, "every public body is subject to action or suit for its torts and those of its officers, employees and agents acting within the scope of their employment

or duties. . . ."  ORS 30.265.  However, the sole action Martinez may pursue is "an action against

the public body" which must be substituted as the sole defendant:

> The remedy provided by [the OTCA] is exclusive of any other
> action or suit against any such officer, employee or agent of a
> public body whose act or omission within the scope of the officer's
> employee's or agent's employment or duties gives rise to the action
> or suit.  No other form of civil action or suit shall be permitted.  If
> an action or suit is filed against an officer, employee or agent of a
> public body, on appropriate motion the public body shall be
> substituted as the only defendant.

ORS 30.265.

Under this authority, the State of Oregon is the only proper defendant with regard to the

Fifth Claim.  However, under the Eleventh Amendment to the United States Constitution, the

State of Oregon is immune from suit in federal court.  "The eleventh amendment bars suits in

federal courts by private citizens against a state.  Where the state is in fact the real party in

interest this bar cannot be circumvented by naming an individual state official or state agency as

a nominal defendant." *Ronwin v. Shapiro*, 657 F2d 1071, 1073 (9th Cir 1981).  Although it

contains a general waiver of immunity, the OTCA does not contain an express consent to suit in

federal court.  Accordingly, Martinez's request for summary judgment on the Fifth Claim should

be denied and defendants' request for summary judgment on the Fifth Claim should be granted.

## IV.  Eighth Amendment to the United States Constitution (First Claim)

This leaves only Martinez's First Claim under 42 USC § 1983 for violation of his rights

under the Eighth Amendment to the United States Constitution.  Martinez has suffered a grievous

injury as a result of the gunshot wound he sustained while housed at SRCI.  However, he has

neither alleged nor proven personal participation in the events giving rise to those injuries by

either Williams or Nooth.  In addition, Fletcher, who pulled the trigger, is entitled to qualified immunity.  Accordingly, Martinez's motion for summary judgment on his First Claim should be denied and defendants' cross motion for summary judgment on that claim should be granted.

### A.  No Personal Participation and No *Respondeat Superior* Liability

Martinez alleges that Williams (ODOC Director) is "responsible for policy at [Oregon] prisons" and that Nooth (SRCI Superintendent) is "responsible for policy/implementation of policy at SRCI, official conduct at SRCI."  Complaint, pp. 3, 8.  Martinez sues Williams only in his official capacity and Nooth in both his official and individual capacities.  *Id*, p. 3.  However, nothing in the remainder of the pleadings or in the record before this court indicates that either Williams or Nooth personally participated in any way in the events giving rise to Martinez's injuries.  At most – and without identifying any particular defendant – Martinez alleges that "[p]rison officials at [SRCI] were aware of the talk and the imminence of a disturbance (brawl)" in the days leading up to the April 6, 2008 riot at SRCI.  *Id*, pp. 5-6.

This allegation is insufficient to impose liability under § 1983.  "A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights.  Liability under § 1983 must be based on the personal involvement of the defendant."  *Barren v. Harrington*, 152 F3d 1193, 1194 (9th Cir 1998), citing *May v. Enomoto*, 633 F2d 164, 167 (9th Cir 1980).  Simply put, "[t]here is no *respondeat superior* liability under § 1983."  *Mortimer v. Baca*, 594 F3d 714, 722 (9th Cir 2010), citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 US 658, 691 (1978).  Martinez's failure to allege personal participation by Williams or Nooth in the events giving rise to his injuries is fatal to his

claim against those two defendants under § 1983.  Accordingly, Williams and Nooth should be granted summary judgment against the First Claim.

### B. <u>Qualified Immunity</u>

This leaves only Fletcher as a defendant with regard to the First Claim.  As previously noted, Martinez has never amended his pleadings to name Fletcher as a defendant.  Pursuant to FRCP 4(m), a court must dismiss an action without prejudice if a defendant has not been served within 120 days after the complaint is filed, unless the plaintiff shows good cause for the failure. On July 6, 2009, Williams and Nooth waived service in this case, but defense counsel declined to waive service on behalf of "Tower Shooter 'X.'"  Waiver of Service (docket #14).  Martinez has not satisfied the 120-day deadline in FRCP 4(m) by identifying, naming, and serving "Tower Shooter 'X'" and has offered no explanation for his failure to do so.  The two-year statute of limitations on his First Claim expired in April 2010.  However, even if Martinez amended the Complaint to name Fletcher as a defendant and timely served him, it is evident that Fletcher is entitled to qualified immunity against the First Claim.

The Ninth Circuit has addressed the applicable standard for imposing liability in the context of an "Eighth Amendment prison riot case involving a guard who had intentionally shot a prisoner to disperse the rioters."  *Porter v. Osborn*, 546 F3d 1131, 1138 (9th Cir 2008).  "'[A] much higher standard of fault than deliberate indifference has to be shown for officer liability' – that is, 'whether the force was applied in a good faith effort to maintain or restore discipline or *maliciously or sadistically for the very purpose of causing harm*.'"  *Id* (emphasis in original), quoting *County of Sacramento v. Lewis*, 523 US 833, 852-53 (1998) and *Whitley v. Albers*, 475 US 312, 320-21 (1986).  Thus, Martinez's claim cannot proceed unless he can demonstrate "that

[Fletcher] acted with a purpose to harm [Martinez] that was unrelated to legitimate law enforcement objectives." *Porter*, 546 US at 1137.

Martinez is unable to meet this standard.  In response to defendants' motion, Martinez raises several arguments, but they fail in light of *Marquez v. Gutierrez*, 322 F3d 689 (9th Cir 2003).  In *Marquez*, the Ninth Circuit found sufficient evidence of an Eighth Amendment violation in a case involving the intentional shooting in the leg of "a passive, unarmed inmate standing near a fight between other inmates, none of whom was armed, when no inmate was in danger of great bodily harm."  *Id* at 692.  Nevertheless, the court extended qualified immunity to the officer who shot Marquez even though the officer may have made a mistake:

> [The officer's] claim of qualified immunity is not defeated simply because a triable issue of fact exists as to whether his decision to shoot Marquez was malicious.
>
> Even if [the officer's] beliefs that Marquez was involved in the kicking incident and that [the downed inmate] was in danger of serious harm were mistaken, he can still be entitled to qualified immunity.  A reasonable official standing where [the officer] was standing – that is, in a tower located 360 feet away from the disturbance – could perceive that both Marquez and another inmate were kicking [the downed inmate] and threatening [him] with serious injury or death, and that [the downed inmate] was not capable of protecting himself, even if no kick was actually administered by Marquez.  The scenario may look different when gauged against the 20/20 vision of hindsight, but we must look at the situation as a reasonable officer in [the officer's] position could have perceived it.  In that light, we believe that a reasonable officer could believe that shooting one inmate in the leg to stop an assault that could have seriously injured or killed another inmate was a good faith effort to restore order, and thus lawful.

*Id* at 693 (internal quotations and citations omitted).

Martinez faults SRCI officials with failing to prevent the riot in the first place by opening the recreation yard. However, he has not in any way linked Fletcher to the decision to open the recreation yard. Martinez has also submitted the affidavits of several other inmates, one of whom attests that unidentified SRCI officials were aware of the possibility a riot might start and stated that they would "just have to shoot one of them to show them who's boss." Delzell Decl., p. 4. Based on that statement, Delzell speculates that Martinez was shot to "send a message to the other inmates." *Id.* However, again, Martinez has failed to link that statement or sentiment to Fletcher. Moreover, under *Marquez*, Fletcher's claim of qualified immunity "is not defeated simply because a triable issue of fact exists as to whether his decision to shoot [Martinez] was malicious." *Marquez*, 322 F3d at 693.

Martinez also disputes: (1) the identity of the inmate he was assaulting just prior to being shot;[4] (2) whether he was actually kicking another inmate or was even in a standing position when he was shot;[5] and (3) how many other inmates were assaulting the downed inmate[6] (pointing out discrepancies in the accounts by various correctional officers); and (4) whether anyone was actually in danger of serious injury during the course of the riot.[7] All of these arguments fall well within the Supreme Court's admonition that this court not second-guess with

---

[4] *See* Delzell Decl., pp. 1-2 (indicating that both he and another inmate, Mark Greeley, were being kicked and disputing that Martinez was involved in the altercation with Mark Greeley).

[5] *See* Plaintiff's Concise Statement of Material Facts (docket #37), ¶ 8 (route of bullet "only possible if Martinez is in a 'squat' or semi-supine position").

[6] *See* Delzell Decl., pp. 1-2 (Fletcher claimed three or four inmates were kicking a downed inmate, while Ponce claimed 10-12 inmates were doing the kicking).

[7] *See* Plaintiff's Concise Statement of Material Facts (docket #37), ¶ 10 (only a few inmates were seriously hurt and "Mark Greeley, believed to be the man Martinez was assaulting [who was] sent to an outside hospital for treatment of wounds to his face and possible brain damage" in fact suffered no life threatening wounds or brain damage).

"20/20 vision of hindsight" the decisions of law enforcement officers faced with rapidly

escalating, dangerous situations and that the qualified immunity inquiry "has a further

dimension" which insulates officers who make "reasonable mistakes."  *Saucier v. Katz*, 533 US

194, 205 (2001).

Fletcher did not know Martinez prior to the riot and states that he "fired only because he

was the inmate kicking the downed inmate in the head."  Fletcher Decl., ¶ 12.  It is undisputed

that the riot involved well over 100 inmates.  At least two inmates (in addition to Martinez)

ended up hospitalized as a result of fight-inflicted wounds.  Multiple inmates ignored verbal

orders from multiple correctional officers to stop fighting as well as ignored the five warning

shots which came from the two guard towers.  Fletcher, who was positioned nearly 80 yards

away from Martinez, shouted verbal orders to stop fighting, fired three warning shots, and finally

took aim at the inmate he saw kicking another inmate in the head and face.  According to

Martinez, "[t]he shooting of Martinez generally stop[ped] the fighting."  Plaintiff's Concise

Statement of Material Facts, ¶ 9.  As in *Marquez*, "a reasonable officer could believe that

shooting one inmate . . . to stop an assault that could have seriously injured or killed another

inmate was a good faith effort to restore order, and thus lawful."  *Marquez*, 322 F3d at 693.

Given that the violent assaults in the recreation yard continued despite non-deadly force tactics,

Fletcher used deadly force to secure the safety of an inmate he believed to be defenseless and at

the risk of serious bodily injury.  This court cannot say that Fletcher's conduct was unreasonable

under the circumstances and must conclude that Fletcher is (or would be if added as a named

defendant) entitled to qualified immunity.

///

14 - FINDINGS AND RECOMMENDATIONS

## RECOMMENDATIONS

For the reasons set forth above, Martinez's Motion for Summary Judgment (docket #36) should be DENIED; defendants' Cross Motion for Summary Judgment (docket #45) should be GRANTED; and judgment should be entered in favor of defendants.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due November 29, 2010. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

## NOTICE

This Findings and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED this 9th day of November, 2010.


s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge